Good morning, Your Honor. Stephen Montoya here on behalf of the Appley Frank Cheatham on what I think is an extremely important issue, and that is the issue of retaliation in the workplace for individuals who reasonably perceive discriminatory harassment and oppose it by trying to stop it. That's what happened in this case. My client, who worked for decades for the Phoenix Fire Department, he's going to have his lunch at Fire Station 1 in downtown Phoenix. His chief assistant starts approaching him holding a pretzel jar, a pickle jar that he just fetched out of Station 1 for everyone to see, that had a penis and testicles scrawled on either side of it, and said, shift B, kitty. Apparently it was used, firefighters, as you know, work 24 or 48 on and then 24 off, so they pitch in money for snacks, and this was their receptacle for receiving those monies, apparently. And Chief Jenkins thought it was inappropriate, so he took it out. He gave it to his boss, my client, Frank Cheatham. Frank Cheatham thought it was inappropriate, too. He continues to walk to Station 1, getting his lunch, and he goes up to a nacho cheese machine. I guess it's one of those receptors that keeps processed cheese warm so you can actually squeeze it or something, nacho cheese. And he sees the same thing, a penis and testicles, cartoon-like, right in the kitchen for everyone to see on the nacho cheese machine. He doesn't say anything. He goes back to his office. He writes the guy in charge of Station 1, a captain, and tells him, hey, you know, knock this off, this is inappropriate. Then the captain, interestingly, sends him an e-mail telling him off, telling him, hey, this should have been kept in-house, you know, we really don't like it. But he was unhappy that it had been sent to HARMS? He copied HARMS on it. He did. He did. His boss. And is that what he was unhappy about? Is that what was not kept in-house? How was it not kept in-house? I don't know. I don't know what he was unhappy about. I think he was unhappy about that Jenkins initially brought it to Chief Cheatham's attention. And you thought that Jenkins should have just talked with him directly? Yes. And I think that he was unhappy that Cheatham brought it up and that HARMS was He shouldn't have been unhappy at all. It's appropriately — anyone should be able to say, hey, that type of drawing that you usually see scrawled in a dirty men's restroom is not appropriate in a workplace kitchen. So everyone got all mad. Judge, you looked like you were about to ask me a question. Judge O'Scanlan. I'm seriously concerned about whether this constitutes either discrimination or harassment. It's childish play, obviously, but is this the sort of thing that rises to the dignity of a Title VII claim? Yes, Your Honor, for a couple of reasons. First of all, just working in a kitchen that has two penises drawn in cartoons, that is hostile. Weren't they taken away as a result of his — Well, they were, but they were because somebody complained about it. Jenkins complained about it and Cheatham complained about it. But in addition to complaining, it's also important to say, hey, not only do we not like the ones that are up, but we also don't want this back. So — and moreover — Did they come back? Well, they kind of did, because when he went — Is that in the record, by the way? Well, yeah, it is in the record. It came back in a few ways, if it ever went away. You know, I'm talking about the drawings. I know, so am I. First of all, Chief Cheatham's working out. That's what fire guys do when they're waiting for a fire. That's the T-shirt incident. Did you ever see the pickle jar or the nacho or the nacho — Nobody saw the same image on two other T-shirts. Moreover, when it was investigated, another deputy chief, Chief Tobin, said, hey, we've had the — pardon my language — cock-and-balls problem at Station 1 for 20 years. And in fact, years ago, Station 1 had actually been sued for the cock-and-balls problem in federal court and lost on a retaliation claim. So I understand your concern, Judge O'Scanlan, that, hey, a couple of distasteful cartoons, it was really more than that. It was on T-shirts. The investigation indicated that it had been up for 20 years, and the city had actually been sued about it and lost. So it was more troubling than that. Then after Chief Cheatham complained about it, Judge, they sent him the pasta, you know, that was shaped like a penis — Did Mr. — did Mr. Cheatham know of the problems at Station 1? Did he know of this prior lawsuit? I don't think he knew of the prior lawsuits. Okay. Did he know of any prior problems at Station 1? No, but he wanted to nip any problems in the bud. Did he know of any complaints by anybody there? He knew of Jenkins' complaint. But other than that, no. Okay. But here's the point. It's — the Supreme Court has repeatedly said that the purpose of Title VII is preventive. You don't want to wait until something turns into a lawsuit in order to be able to object to it. If people are drawing penises on the wall at work, you want to stop it before it creates a big issue. And that's why employees are encouraged to complain before — But this has been going on for 20 years. This has been going on for 20 years. Well, apparently — that's what one of Chief Cheatham's colleagues admitted during the investigation, Judge. So it had been going on for 20 years. So it wasn't the trivial problem that the district court reduced it down to. The points that I just made are alien to the district court's order. This was a longstanding problem that needed to be addressed. And moreover, it wasn't a trivial problem. At least in most places that I've been, that type of stuff is not really drawn in the kitchen for everyone to see. That's the kind of stuff — Have you ever been at barracks, a military — were you ever in the military? No, I was not. In a fraternity in college? Yeah, I was, Your Honor. This is a frat boy stunt, isn't it? Well, but when — but it's in the — a frat house is not a workhouse. That's a private place. And, hey, what you draw in your private residence is your own business. But what you draw in the workplace, that's an entirely different matter. So this was a serious matter. It's actually led to a lawsuit that the city lost. And we're talking about explicit pornography in the workplace that needs to be stopped. And it should be stopped before it becomes a pervasive problem. It's not pornography. Well, I don't — you know what, whether it's — well, I think pornography depends upon context. And a cartoon penis in the workplace kitchen I think does — I think is pornographic in context. But I would like to save the remainder of my time for rebuttal so my colleague can address Your Honor's — You allocated five minutes to the EOC. Yes, I did. I'll leave you with about a minute and a half. I understand. Okay. Thank you, Judge Bybee. Yeah. Excuse me. May it please the Court, Anne King on behalf of Amicus Equal Employment Opportunity Commission. I'd like to just jump in on some of the questions that came up during Mr. Montoya's presentation. It sounds like Your Honors are particularly interested in the question of whether the statute violated Title VII. And I'll begin by determining that no reasonable jury could find that Chief Cheatham had a reasonable belief that he was reporting unlawful conduct under Title VII. The district court did get the standard right. Cheatham did not need to demonstrate that the conduct he complained of actually violated Title VII. He only needed to show that he reasonably believed that there was a violation of the statute. And coming back to the question, Judge Bybee, that you posed regarding the initial incident with the images on the jar and the cheese machine, Judge Bybee, you asked whether those images returned. And it's true that the fire department stepped in, that somebody took those particular images, didn't return. But I think the key question when looking at Chief Cheatham's reasonable belief is whether he had a reasonable belief at the time that he made the report. And at that time, he wouldn't know what might happen subsequently in terms of the fire department's actions. So certainly by the time that the incident with the pasta occurred, he had a reasonable belief at that time that even though some incidents didn't recur, there had been a recurrence of sexually explicit imagery in the workplace. Did the district court reach the causal nexus, the causal link here? No. The district court focused on only one issue, which is the only issue that the commission addressed in our brief, and that's whether Chief Cheatham engaged in protected activity. And so we didn't focus on the causation issue or the adverse action issue at all. You know, Judge Mahan, I think you had a question about the sort of the tenor of the workplace at the firehouse and suggested that maybe it's a little bit similar to military barracks. But I think, again, perhaps going back in time, it's unclear whether Cheatham had a reasonable belief after the first incident, although it certainly, as Mr. Montoya was explaining, it's not appropriate to have such images in any workplace. And Chief Cheatham himself said that he found that those images were inappropriate. But again, certainly after multiple incidents involving sexual imagery in the workplace, that had crossed a line and the commission had argued and asked this Court to also conclude that he could have reasonably believed that the cumulative incident supported a reasonable belief that there was a violation of the statute. What's our standard of review on that aspect? Oh, yes, Your Honor. It's a de novo standard because, again, it's a summary judgment posture. And the question is, could a reasonable jury find that Chief Cheatham, when he made the reports of unlawful activity, that he had a reasonable belief, that he reasonably perceived that those incidents violated the statute? Where is the line between this is bad behavior that we ought not to put up with here and this violates Title VII? Yes, Your Honor. Well, I think that it is helpful to look at the hostile work environment standard, although, again, Chief Cheatham did not need to establish that there was an actual hostile work That would consider the context of the workplace and whether individuals might be offended. So it would have to be objectively offensive. But something could be inappropriate. The mouse on the board was inappropriate, but it wouldn't violate Title VII. Yes, Your Honor. That's right. That's a good example of something that would be inappropriate and yet not violate the statute. And this surely was an immature act by somebody and may have been tolerated because maybe the jar had been around for a while, although Chief Cheatham had been eating, taking meals at Station 1 for a long time and hadn't seen it before. He was relatively new to the station. He'd started, I believe, in March 2009, and this was around November 2009. That's six months without seeing a pickle jar. That was pretty obvious. Right. And a nacho cheese machine, which was pretty good-sized. And that could push in the other direction that it was a newer incident. And I realize I'm encroaching on Mr. Montoya's rebuttal time, so I'll be very brief. It could push in the other direction that it was something that hadn't been tolerated, and so Chief Cheatham could have reasonably felt that it was particularly inappropriate. Okay. So if he's just trying to nip something in the bud that could be really bad, were there female firefighters at this station? Your Honor, the record does reflect that at South Shift Command, where Chief Cheatham worked and where I believe the gym was located, there were women who used the gym. Right. That would have been the t-shirt problem. Correct. That's right. I didn't see anything in the record that suggested there were any women who worked at Station 1. I'm not aware of anything in the record. Okay. So if he thinks I'm going to nip something in the bud before it becomes a really, really bad problem, does that mean then that any incidental problem that might become a violation of the statute all of a sudden becomes a violation of the statute for purposes of retaliation? Well, in our — in the Commission's brief, we advocated for adopting a standard that the Fourth Circuit has adopted, which is — Is that Boyer-Liberto? That's correct, Your Honor, the in-progress standard. And that's if a hostile work environment is in progress, and that would support a reasonable belief of a Title VII violation for retaliation claims. But here, I don't think that this would — But doesn't that require us then to extrapolate and draw the worst out of human behavior and the worst out of every case we could find? In other words, if we can say, look, this was this. Yes, we had the pickle jar and a nacho and we had inappropriate drawings, but in another case, we had all kinds of really awful things and all Judge Cheatham — all Captain Cheatham was doing was trying to interdict this before it got started, trying to stop something from deteriorating into that. If that's the case, then we can just let our imaginations run free, and anything may become a hostile work environment. Well, Your Honor, I don't think that that's quite right, that anything could become a hostile work environment. There certainly are limitations. And I think a couple of examples that might help sort of suss it out. The example of the dead mouse. Now, that doesn't have a relationship to any protected characteristic under Title VII. It's just a juvenile prank. It's not related to sex or religion or race. And so that is not the type of thing that could become a hostile work environment, unless there were some other facts that don't exist here. And also another example, the district court relies on the Clark County versus Breeden decision, which we think is quite different because that involved a single incident and quite a minor one versus the multiple incidents here. But a situation like that where it's a very minor incident, even if that were repeated, that would not likely rise to the extent that could support a reasonable lead. Counsel, could we decide this case without engaging in the in-progress hostile work environment theory? Yes. I think you could in this case because there were multiple incidents that Chief Cheatham reported. By the time, again, by the time the pasta incident occurs, he has seen the recurrence of sexual images in the workplace despite his complaints. And they, you know, certainly the pasta incident I think could be characterized as the most extreme of those incidents. Although at this point, that one is directed at him. Correct, Your Honor. If he's complaining that he is being forced out, that all of this was devoted to him, that all of this was to offend his sensibilities, that would be a very different case than saying I'm stepping in because I'm afraid other people are going to see the drawing on the pickle jar. So the pasta really doesn't add anything to that theory. Well, it adds something, I think, just to the idea that at some point he did have a reasonable belief that he was reporting unlawful conduct. Sure. But there isn't any unlawful conduct after the pasta. After the pasta, there is not. That's correct. He doesn't complain about anything. So the pasta doesn't really add anything to his case, does it? Well, it does because the retaliation occurs after the pasta. And perhaps a jury could determine that even though there were people who were angry about his prior reports, it was really the pasta that was the nail on the coffin. What was the elapsed time between the pasta incident and his reassignment? I believe it was about three or four months, Your Honor, before the decision was made. And we did not address the causation issue because the district court didn't focus on that at all. Okay. All right. We've taken you well over your time. I will make sure that Mr. Montoya gets his time. Thank you, Ms. King. Thank you, Your Honor. Let's hear from the city. Good morning, Your Honor. Peter Prinkevich of Littler Mendelson for the City of Phoenix. Your Honors, I would like to emphasize and highlight two issues for the Court's consideration and discuss them in the context of the record that's before the Court. The first issue I want to talk about is protected activity. And then the second issue is causation, because although the district court didn't focus on causation, that was an issue that was briefed as well and is an issue that we raise again for the Court's consideration. Now, with respect to protected activity, the issue is, is the evidence in the record sufficient to support a reasonable belief that Chief Cheatham reasonably believed that a sexually hostile work environment existed based on what he knew at the time and what he said and what he did? So regarding that, I think it's important to set the scene for Your Honors. Station 1 is a separate building. It's right across the driveway from South Deputy Command, where Chief Cheatham worked. And he was assigned there to South Deputy, which you'll see is called South Deputy as well in the record, effective March 9, 2009. He went over to Station 1, which is across the street, he said, almost every shift. He ate dinner there almost every shift. At no time from March 9, 2009 to November 4, 2009, did he see any sexually explicit material whatsoever. On November 4, 2009, he saw Courtney Jenkins bringing the pretzel jar across the driveway. That same day, he went in to eat dinner at Station 1 and saw the nacho cheese machine. Now, he didn't do anything about the machine. He didn't tell anyone to take it down at that time. He went back across to South Deputy and wrote the email to Battalion Chief Brian Johnson. A Battalion Chief, Your Honors, is a supervisor of multiple stations. Okay? And the captains are underneath Battalion Chiefs. Battalion Chiefs report to Deputy Chiefs, who was Chief Cheatham. And Chief Cheatham reports to an Assistant Chief, who was Chief Harms. So that was the one incident. He wrote to Brian Johnson. The nacho cheese machine was cleaned up. The pretzel jar never came back. The second incident, shortly after November 4, 2009, was when he saw a T-shirt in the gym at South Deputy across the street, not at Station 1. One more thing I forgot to add, Your Honors. Chief Cheatham, regarding what he knew at the time, he didn't know how long the pretzel jar was there. He didn't know if anyone had seen it. He didn't know if anyone was offended by it. He didn't know how long the drawing on the nacho cheese machine was there. He does know that he had just been there two days earlier, and it wasn't there. So that's what he knew at the time regarding that incident. Regarding the T-shirt in the gym at South Deputy, there was nobody with it. He picked it up. He took it upstairs. He asked a few people about it, including a female. No one said they were offended by it. And he took it back downstairs and put it back. He folded it up and put it back in the gym where it was. The second time he saw the T-shirt was just a few days later, also in November, where Deputy Chief Brian Tobin was wearing it in a common area, and it was not on duty. I think there's evidence in the record, in the excerpts of record, that Chief Tobin said it wouldn't have been appropriate to wear that shirt on duty, but he was off duty. Again, no indication from Chief Cheatham or no knowledge, nothing in the record as to who saw the shirt, who was offended by it, or anything. And then the last thing is... Was it inappropriate for Cheatham to comment on this? No, it was not inappropriate. Why is it not inappropriate for him to comment on this? Why is it not inappropriate for Chief Cheatham to comment? Yeah, I'll put it in the positive. Why was it appropriate for Cheatham to comment on this? Well, it's okay because Chief Cheatham thought that it was inappropriate. Why should a chief in Phoenix be concerned about those kinds of drawings? Well, he should be concerned about those kind of drawings, and he was concerned about those kind of drawings because he thought they were inappropriate for the workplace. Right. Are they appropriate for the workplace? They are not appropriate. They're not appropriate. Okay. So we don't do we don't so he was doing the right thing. He was doing the right thing. And in fact, Judge, tying this into the causation, when he reported it to Chief Harms, and Mr. Montoya mentioned earlier that Bryant Johnson, who's a subordinate to Chief Cheatham, wrote back in the e-mail, he said we're going to take care of it, we're going to have a meeting, we had a meeting, it's all taken care of. But Chief Cheatham, you should have kept it in-house. And you know what? You're always coming over here to eat meals. You're not welcome. I know about the complaints about the meals. I'm just trying to figure out at this point, let's suppose, so you just have to I understand this would be contrary to your argument, and I have a lot of questions about this, but let's suppose that Cheatham could show that there was some causal link between his complaints about this. Somebody said, oh, man, you just got a hair trigger. You're going to be jumping all over these guys. We don't want you jumping all over these guys when they're just being guys. So that we could show the causal link. Why is it, if it's not inappropriate for Cheatham to be commenting on this, because Phoenix doesn't want to be in the position of tolerating this kind of behavior, then why isn't it not much of a step for Cheatham to say, look, you can't fire me for that. I'm doing what I'm supposed to do. And if I don't do it, it may become a whole lot worse. The answer to that, Judge Bybee, is because there has to be some objective standard in Title VII. There's objective standards all throughout Title VII. And the objective standard that we're dealing with here, can the employee reasonably believe that there's a hostile work environment that exists? So it's based on his reasonable belief. You can't be protected for any kind of complaints. The mouse complaint is an example. There are multiple other kinds of complaints. Well, the mouse is not related to a protected ground in Title VII. Unsanitary conditions is not the same as sexual harassment. Well, the example in Clark County v. Breeden that the Supreme Court dealt with, that was a sexual issue. Remember, what happened in the Breeden case is the employee and her supervisor were reading psychological tests. And one of the answers was, making love to her is like making love to the Grand Canyon. And the other male employee said, or the male employee who was reading it said, I don't know what that means. The other male employee said, I'll explain it to you later, and started laughing. And the female employee was offended by it. It was a comment of a sexual nature, talking about making love, that was a sexual comment. That, if that kind of thing kept on going over and over and over and over, that might rise to the level. But there the Supreme Court said, no reasonable person could reasonably believe that this was a hostile work environment. And that's because, remember how high that standard is, Judge. It's so severe and pervasive that it actually alters the condition of the victim's employment and creates an abusive working environment. Three incidents here, the two involving the drawing, the two involving the T-shirt, and the one involving the pasta, cannot be said to create that environment. I certainly agree with you that if we were here on a simple hostile work environment claim, that if Cheatham were saying it's just impossible to work in Station 1, this is such a sex-laden place that it's deeply offensive and I can't work, I can't concentrate, this would be a very different problem. The problem is, is that he's tried to stop it, and he claims that he was disciplined for that, that he was assigned to a much lesser position at the safety station or wherever it was. So we're here on a retaliation problem. Retaliation for calling attention to something that you've conceded, that the city concedes, was inappropriate. But when we're here on retaliation, that's right, Judge Bybee, but we have to look at the hostile environment standard, because that's what you do. You have to see is there enough, based on what Chief Cheatham knew at the time, for him to have reasonably believed that there was a hostile environment standard, objectively. But in order to find, to determine that and consider that, you have to look at what the hostile environment standard is. And this judge is much more like what the Supreme Court has said over and over, the kind of juvenile, offhand, teasing, inappropriate stuff for the workplace, but does not rise to a hostile working environment. And so that's what the argument that the city is making with respect to the protected activity. Secondly, I also wanted to at least address the causation argument. Before I move on, does anyone else, Your Honors, have any other questions on protected activity? Kennedy. I guess we have to respond to Ms. King's comments about the in-progress theory coming from the Fourth Circuit, Boyer-Liberto. Yes, Judge O'Scanlon, thank you. The city believes that that is not the proper standard for Title VII. Remember, what we have here is with the opposition clause in the text of Title VII, employers are prohibited from discriminating against any employees who oppose an unlawful employment practice. This Court and others have already added to that by saying it's not only an unlawful employment practice that you need to oppose. If you oppose something that you reasonably believe to be an unlawful employment practice, you're covered. Now, the EEOC asks us to take another leap from that point to say not only is the hostile environment in progress, so let's look back to the Clark County v. Breeden matter. Discussion of sex, laughing about it that's offensive to a female. One time like that is, the Supreme Court said, not sexual harassment. So you're not really disagreeing with the in-progress theory. You're focusing, as you have done earlier, with respect to this particular conduct as to whether it really rises to the level of a hostile work environment. Well, Judge O'Scanlon, I am focusing on the record and saying it doesn't meet that standard either, but I am disagreeing with the in-progress standard because I think that expands liability way too far and it gives us the chance to anything one time, if it's repeated or if it happens or if it's in progress, and there's no way to know if it's in progress. You have to assume that that's going to happen. So that would be just way too expansive. So you would suggest we not follow the Fourth Circuit? I would suggest you not follow the Fourth Circuit. And also, keep in mind that in Boyer libido, even the Fourth Circuit limited it at least somewhat. They said the incidents here, which involved a particularly egregious racial slur, are so humiliating that maybe this falls under the Supreme Court statement that isolated incidents, unless particularly severe, do not meet the standard. They said these things are so severe, coupled with the fact that it was a supervisor who was making the comments, someone who was threatening her job as well, that's what the Fourth Circuit focused on in that case. Your Honors, if I could just take the rest of my time to talk about causation as well, because that's an important issue as well. And we're talking about but-for causation, which in this context means that Chief Cheatham would not, he has to show that he would not have been transferred, reassigned to safety, unless he made the complaints to Chief Harms. So that's the standard of what he has to prove. But when we look at what happened on the record again, he advises Chief Harms of these issues. At no point, and this is based on his own testimony, at no point does Chief Harms ever express any unhappiness with him, any anger. At no point does he do anything to lead Chief Cheatham to believe that he's unhappy with what Chief Cheatham is reporting. So that's an important issue. And the second thing is, keep in mind that the fire chief and the executive staff make these reassignments regularly. Look at Chief Cheatham, his own personal example. February 25, 2008, he's a deputy chief, he's assigned to aviation. He's there a little over 12 months. March 2009, he's assigned to South Deputy Command. He's there a little over 12 months. Because March 2010, he and 15 other chiefs are reassigned, and Chief Cheatham is assigned to safety at this point. But there's no reason to believe, there's no evidence in the record, other than the fact, and I know that counsel will bring it up, the timing of the issue, which is, he complains November 2009, the reassignment is in March. But that's when the reassignments are every year, and that's in the record. There are multiple memos in the record on these reassignments. So since Chief Cheatham had been assigned three times in two years as the deputy chief, there's no basis to conclude that his complaints were the but-for cause of his transfer here, particularly in light of that the complaints were well received, and what it started to say before was that when Bryant Johnson kind of chided Chief Cheatham for making his complaints, there was a meeting between Chief Harms, Chief Cheatham, and Bryant Johnson, in which Chief Harms coached Bryant Johnson to say, that was inappropriate. You're not to tell a deputy chief where they're to take their meals. And, in fact, Courtney Jenkins was proper by bringing it to Chief Cheatham, and this kind of behavior should not be tolerated. So everything that happened when Chief Cheatham brought these matters to Chief Harms or higher at the assistant chief level, they were acted on. The matters were taken care of. They never reappeared. And no one indicated any dissatisfaction to Chief Cheatham whatsoever. So for that reason, Your Honors, we would ask the Court to affirm on the basis of there is no protected activity and affirm on the basis that there is no causation. And unless the Court has any questions, that's it for me. Okay. Thank you very much. Thank you. Your Honors, the Supreme Court of the United States in Burlington Industries v. Ellerth, a foundational case on page 764 of the opinion, ruled that Title VII should be construed, quote, to encourage employees to report harassing conduct before it becomes severe or pervasive. The district court ignored that principle in this case. The objective standard that the court is searching for is in this case. How more objective can you be? There's a graphic drawing of the male reproductive organ referred to by Fire Department executives as the cock and balls, the symbol of Station 1, scrawled repeatedly where everyone can see in Station 1. Causation. That's addressed on page 45 through 48 of our opening brief. First of all, the timing. After he complains, four months later he's gone. Other south shift commanders had actually been positioned there for years and years. He was the only one who was only there for a year, only four short months after he complained. They never gave him an explanation. Counsel, are you telling us that you think that the record is sufficiently developed that we could decide this case on causation if we decided to? Well, Your Honor, the record. And that's what the opposing counsel wants us to do. Well, Your Honor, I will answer your question. Your argument seems to be that, yes, we can do that. Your Honor, they moved for summary judgment on that issue. We responded. So the answer would be yes. But he was given no explanation for the transfer. Four months after he complained, other people had spent years at south shift command. The captain. Fifteen other deputy chiefs were reassigned at the same time, correct? He does, but not from south shift command. And other south shift commanders had been there for years and years, from five to eight years. Moreover, after he complained, the captain of Station 1 actually told him, and that's Rich Bauer, and this is on page 45 of our brief, that Cheatham wouldn't last at south shift command long because he had the temerity to believe that he could, quote, make them follow the rules. And was Bauer in a supervisory position? He was a captain. And he was one of the captains of. Is he above Cheatham? No. No, he wasn't above Cheatham, but he was a supervisor. A supervisor of Cheatham? No. Okay. He was a supervisor of other firefighters. So he's below Cheatham? He is, but he was a supervisor. Do you have any evidence that Mr. Bauer talked to Chief Harms? No. However, that's what a supervisor said as soon as this happened. Who made the decision to move Cheatham? The chief, and that's a good point. That would be Harms? No, that would be Robert Kahn. And he was silent as to why he made the decision. In fact, to this day, Judge Bybee, the city of Phoenix hasn't articulated a reason why it chose to transfer Chief Cheatham. He was doing a fine job at south shift command. That's undisputed. And there's no other reason for transferring him other than the reason that four short months after he complained of these graphic drawings in the Phoenix Fire Department, he was transferred. How much time did Your Honor give me? You're well over your time. I've given you about three additional minutes. Judge Bybee, I appreciate it. And, Your Honors, thank you for your time this morning. I appreciate it. Thank you. Thank you, Mr. Montoya. We thank counsel for the argument in the case. It was helpful. And with that, we have completed the oral argument calendar, and the Court stands adjourned.
judges: O'scannlain, Bybee, Mahan